**Reverse and Render in part, Modify in part, and Remand for new punishment and
Opinion Filed July 22, 2015**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

### No. 05-14-00215-CR
_____

**BRIAN MARTIN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the County Court At Law No. 1
Kaufman County, Texas
Trial Court Cause No. 31995CC**

---

## MEMORANDUM OPINION
Before Justices Francis, Lang-Miers, and Whitehill
Opinion by Justice Francis

Brian Martin appeals his convictions for engaging in organized criminal activity by causing a dog to fight another dog and using real estate for dog fighting. After finding appellant guilty, the jury assessed punishment, enhanced by a prior felony conviction, at three and five years respectively, and a $10,000 fine for each offense. In thirteen issues, appellant contends the evidence is legally insufficient to support his convictions, the trial court erred by denying his motion to quash and by giving an incorrect parole instruction to the jury, and his convictions on both counts violate his right against double jeopardy under the United States Constitution. We reverse the trial court's judgment in both counts to the extent appellant was found guilty of engaging in organized criminal activity and render judgment he is not guilty of engaging in organized criminal activity in counts one and two. We modify the trial court's judgments to

reflect appellant was found guilty of the lesser included offenses of dog fighting by causing a dog to fight another dog and using his property for dog fighting. We remand this case to the trial court for a new punishment hearing as to each offense.

In his first six issues, appellant challenges the sufficiency of the evidence to support his convictions. In issues one and two, appellant claims no evidence shows he intentionally or knowingly caused a dog fight or used or permitted his property to be used for dog fighting, and in issues three and four, he contends the evidence is insufficient to show one particular dog fought another or did so on certain real estate. In issues five and six, he argues no evidence shows he intended to establish, maintain, or participate in a group of three or more to work together in a continuing course of criminal activity; the State concedes issues five and six but maintains the evidence is sufficient to support the lesser included offenses of dog fighting by causing one dog to fight another and by permitting his property to be used for dog fighting.

When reviewing a challenge to the sufficiency of the evidence, we examine the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury, as factfinder, resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from basic to ultimate facts. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Thus, when analyzing the sufficiency of the evidence, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Id*. For purposes of proving guilt beyond a reasonable doubt, direct and circumstantial evidence are treated equally. *Id*.

As set out in the court's charge, a person commits the offense of engaging in organized criminal activity if, "with the intent to establish, maintain, or participate in a combination or in

the profits of a combination or as a member of a criminal street gang, the person commits or conspires to commit" the offense of dog fighting. TEX. PENAL CODE ANN. § 71.02(a)(15) (West Supp. 2014). Dog fighting includes (1) intentionally or knowingly causing a dog to fight with another dog or (2) using real estate for dog fighting. *Id*. § 42.10(a)(1), (3) (West 2011). "Dog fighting" is defined as "any situation in which one dog attacks or fights with another dog." *Id*. § 42.10(b)(1). Under each organized criminal activity count, the trial court also instructed the jury on each of the lesser included offenses of dog fighting.

In the dog fighting counts, appellant was first charged with intentionally or knowingly causing one dog to fight with another dog. In the second, he was charged with intentionally or knowingly using real estate for dog fighting. To support a conviction for the first offense, the State was required to show, either by direct or circumstantial evidence, that appellant caused one dog to attack or fight another dog. *See id.* § 42.10(a)(1), (b)(1). In contrast, to convict appellant of the second offense, the State was required to prove only that appellant allowed a dog fight on his property; the second offense did not require a showing that appellant caused a dog fight. *See id*. § 42.10(a)(3).

At trial, Corporal James Lyons of the Terrell Police Department said he responded to a call about dog fighting. He drove to appellant's property at 507 West Newton where he saw a group of middle-aged men standing near a partially built structure. Lyons heard a "commotion, barking and snarling of dogs, you know, the yelling of people." He stopped and got out of his patrol car. As he approached the group, the men began to disburse, and at least one man ran off into the bushes. Appellant walked up to Lyons and asked why he was there. When Lyons said he was responding to a call about dog fighting, appellant said a couple of his dogs got off their chains and started fighting. He later told Lyons he was trying to breed two of the dogs and they got into a fight.

Lyons noticed several of the men had blood on their hands, pants, and shoes; one or two of them were trying to wash their hands off in a large drum container full of water. There were eleven pit bull dogs visible in the area; several had fresh wounds that were "extensive," and one or two appeared to be "bait dogs." Lyons noticed most of the dogs were heavily chained while others were tied up with nylon rope. A lot of blood was found in a central area, near the partially built structure, but no puddles of blood were near each chained dog. The amount of blood and its location led Lyons to believe a dog fight had occurred and that it was not an accident, as appellant claimed. Lyons also found bloody tow chains and a bloody stick, implements of dog fighting. He knew tow chains were used in dog fighting for "exercising the dogs, or hanging them up" and the "bloody stick is used to break apart their jaws when one dog latches onto another one." Appellant initially said all the dogs were his but later admitted one of the female dogs, a brown pit bull, belonged to Antwine Thomas, who was at the scene when Lyons arrived. Lyons said based on his knowledge of animals, the recent injuries to the female dog were not consistent with breeding because her injuries were to the face and legs and not to the neck and back. He also told the jury the brown female pit bull did not appear to be in heat. Lyons called for backup, including Animal Control, and notified the chief inspector for the SPCA. He also called for a detective, a forensic detective, and the forensic unit to come to the scene.

Cecila Wuichmann, the Terrell Animal Control officer, responded to Lyon's call. One of her primary concerns was to determine whether any of the dogs on the property needed medical attention. Most of the dogs were in bad shape, and several had open lacerations, bleeding wounds, and fractures. She saw no dog food in the vicinity and although there were buckets with water, the water was dirty or bloody. She did not believe this was a situation where two dogs had been breeding because four dogs had open wounds. She believed it was a dog fight. Erica Angel, a forensic investigator, took over one hundred photographs of the scene, including

photographs of the dogs and their injuries. She also collected the chains, collars, bloody stick, a large fishing scale hanging in a tree, and other items at the scene. Officer David Bridges said the "condition of the property itself based on how the dogs were housed, and how they were kept on the property" was not consistent with somebody who was a pet owner; rather, it "looked like the dogs were kept there for a purpose." According to Bridges, that purpose was dog fighting.

Pamela Ashley is a veterinarian with the SPCA of Texas. She was called to appellant's property to assess the extent of the dogs' injuries. A male blood-covered dog lying by a fence had the most serious injuries and was examined first. Although the decision was made to euthanize the dog at the scene due to its injuries, it bit Ashley and had to be transported to the SPCA to be checked for rabies prior to euthanization. Ashley saw at least three other dogs with fresh wounds. After she completed her initial assessment of the dogs, they were loaded into vans and taken to the SPCA facility in Dallas where they were vaccinated, examined, and photographed. One brown female had blood dripping from its muzzle at the time it was photographed.

According to Ashley, the entire group showed a lack of basic health maintenance. She noted no dog food, dog bowls, or clean water had been found on appellant's property. All the dogs she examined were underweight, yet very muscular. Each dog had parasites, including round worms and hook worms. Four tested positive for heartworms. Ashley concluded, based on the scars, injuries, and lesions, that all had been "in a fight with a dog at some point and time except, for the younger one." One male (not the one that bit Ashley at the scene) and two females had recent injuries on the face, neck, and legs that Ashley described as significant wounds, like wounds a dog would sustain in a dog fight, but not during breeding. Ashley classified one of the dogs with fresh wounds as a bait dog.

Art Munos is a special investigator with the animal cruelty unit. He was called to appellant's property to assist in the investigation. As someone familiar with dog fighting, he explained to the jury how a person would get his dog ready for fighting as well as the process of dog fighting. In Munos's opinion, the large chains at appellant's property were used to strengthen each dog's neck. The dogs were tethered just outside of each other's reach to increase antagonism and heighten the anticipation of the fight. Munos explained that the purpose of a bait dog, generally an older or injured dog, was to spar with the fighting dog to warm it up without harming it. He described the various "tools" found on appellant's property as typical dog fighting tools, including the bloody stick used to break up a fight, the heavy chains for strengthening a dog's musculature, and a hook scale for weighing dogs. The scale is hung from a tree; the dog is then hoisted and hung by its collar to get its fighting weight. Several buckets of bloody water and soap were also found.

According to Munos, if the people fighting the dogs follow "Cajun" rules, a person is allowed to wash his opponent's dog to ensure there are no toxins, poisons, or other bad-tasting substances on the dog's coat that would prevent the dog from being bitten by its opponent. The soap and buckets of water were like those used to wash off foul-tasting substances. Munos also said it was unlikely the injuries on appellant's dogs were caused by breeding because most breeders use a "rape stand" to protect the female from injury during breeding. Munos told the jury the dogs on appellant's property were from the Nigerino bloodline, a "high bloodline for fighting. And, it's a very popular bloodline in Texas." Although most of the dogs belonged to appellant, one of the female dogs, a brown pit bull with a laceration on its paw and bite wounds to the face, belonged to Thomas. Finally, Munos reviewed certain documents appellant filed with the trial court and noted several phrases, such as "yard accident" and "shot the dogs up,"

that indicated appellant was familiar with dog fighting and its terminology. Munos believed appellant was fighting his dogs and had done so that day.

Appellant contends, and the State concedes, the evidence is insufficient to support his conviction for engaging in organized criminal activity because no evidence shows he committed or conspired to commit the offense of dog fighting "with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang." After reviewing the record, including the testimony of all witnesses, we agree. We sustain appellant's fifth and sixth issues. In light of our disposition of these two issues, we need not address appellant's ninth, tenth, and thirteenth issues which further challenge his convictions for engaging in organized criminal activity.

Although appellant also contends the evidence does not support his convictions for the lesser included offenses of dog fighting, we do not agree. The evidence shows Lyons responded to a call about dog fighting and found activity consistent with a dog fight. The group of men present had blood spattered clothes and shoes, and several were washing blood off their hands. Most of the eleven pit bull dogs were tethered with heavy tow chains although several were tied up with nylon rope. The ground near the partially built structure was bloody, and the buckets contained bloody water. At least four dogs showed recent injuries consistent with being in a dog fight. An injured female dog with fresh wounds belonged to Thomas, one of the men present at the time. The remaining dogs belonged to appellant; of those, at least three showed signs of recent fighting, including a severely injured male dog covered in blood and another dog with characteristics typical of a bait dog. Various dog fighting "tools" were found, including a scale for weighing dogs prior to a fight, a bloody stick for breaking up fights, and the heavy chains used to tether many of the dogs. Viewing all the evidence in the light most favorable to the verdict, we conclude a rational jury could have determined beyond a reasonable doubt that

appellant intentionally or knowingly caused one of his dogs to fight with another one of his dogs. Furthermore, the jury could have determined that Thomas caused his dog to fight with one of appellant's dogs and that appellant allowed his property to be used for that dog fight. We overrule appellant's first, second, third, and fourth issues.

In his seventh and eight issues, appellant contends the trial court erred by denying his motion to quash the indictment. During a pretrial hearing on his motion to suppress, appellant also sought to quash the indictment for alleging a pit bull as a deadly weapon. We note that, at trial, appellant did not object to the deadly weapon allegation in the jury charge nor does he now challenge the sufficiency of the evidence to support the deadly weapon finding by the jury.

We review a trial court's ruling on a motion to quash de novo. *Lawrence v. State*, 240 S.W.3d 912, 915 (Tex. Crim. App. 2007). Only certain limited matters may be reviewed on a pretrial basis with respect to indictments. *Patterson v. State*, 353 S.W.3d 203, 209 (Tex. App. – San Antonio 2011, pet. ref'd). "An indictment must be facially tested by itself under the law, as a pleading; it can neither be supported nor defeated as such by what evidence is introduced on trial." *State v. Rosenbaum*, 910 S.W.2d 934, 948 (Tex. Crim. App. 1994) (op. on reh'g adopting dissent). A trial court may not go behind the face of an indictment to make a pretrial determination of the merits of allegations made in the charging instrument. *Id*.

All felonies are theoretically susceptible to an affirmative finding of the use or exhibition of a deadly weapon. *Patterson v. State*, 769 S.W.2d 938, 940 (Tex. Crim. App. 1989). A deadly weapon means "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury" or "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (West Supp. 2014). We give effect to the plain meaning of the statutory text,

unless the language is ambiguous or the plain meaning leads to absurd results that the Legislature could not have intended. *Thompson v. State*, 236 S.W.3d 787, 792 (Tex. Crim. App. 2007).

In both counts of the indictment, the deadly weapon allegation provided:

> And it further presented in and to said Court that a deadly weapon, to-wit: a pit bull, was used or exhibited during the commission of the aforesaid offense or during immediate flight following the commission of the aforesaid offense, and that the defendant used or exhibited said deadly weapon or was a party to the aforesaid offense and knew that a deadly weapon would be used or exhibited.

We first note that appellant's argument on appeal assumes that the use of a pit bull as a deadly weapon was directed only at another dog and not at a human being. He contends that the legislature never intended for a dog involved in a dogfighting case to be a deadly weapon against the other dog or dogs in the incident. We do not agree with appellant's limited reading of this indictment. This specific argument was addressed in the written motion to quash as "A pit bull is not a deadly weapon," and was not touched upon during the questioning of the one witness, officer Lyons, who testified during the hearing on the motion to quash. The primary focus of the hearing on the motion to suppress was on the arrest of appellant, the lack of a search warrant, and the admissibility of statements made by appellant at the scene. Only during closing argument at the hearing did counsel argue his motion to quash, claiming that as to the deadly weapon allegation, the officer did not testify to anyone being "in danger or hurt" by a pit bull; the indictment failed to name a specific pit bull; or that it had to be "another human, Your Honor, not that two dogs were in danger." The trial court overruled the motion to quash.

At the time appellant's argument was made, the only evidence the trial court had about the charged offenses was that Lyons arrived at appellant's property and discovered several men with blood on their clothing and shoes, large amounts of blood on the ground, buckets of bloody water, and several pit bull dogs displaying recent injuries consistent with dog fighting. Although it was unclear whether the State intended to prove the deadly weapon allegations were directed at

–9–

a person or an animal, appellant was not entitled to a pretrial determination of the facts surrounding those allegations. *See Rosenbaum*, 910 S.W.2d at 948 (holding a trial court cannot go behind the face of the indictment and make a pretrial determination regarding the sufficiency of the evidence to support or defeat an element of the offense); *Patterson*, 353 S.W.3d at 210 (because the trial court had no evidence before it establishing the facts surrounding the charged offenses, appellants cannot complain of adverse ruling made by the trial court on a matter the trial court was not permitted to consider). On appeal, appellant cannot complain of an adverse ruling made by the trial court on a matter the trial court was not permitted to consider. *See Patterson*, 353 S.W.3d at 210.

As to the merits of appellant's argument that a pit bull can never be used as a deadly weapon against another dog in a dogfighting case, we decline to make that determination. Nothing in the plain language of section 1.07 limits the definition of a deadly weapon to offenses against human beings. *See McMillian v. State*, No. 05-04-01321-CR, 2005 WL 2901720, at *3 (Tex. App.—Dallas Nov. 4, 2005, no pet.) (not designated for publication). And the plain language of section 42.10, entitled "Dog Fighting," does not preclude a deadly weapon allegation of any kind for enhancement to the charged offense. Because the language of these statues is unambiguous, we decline to read the limiting language appellant proposes into either statute.

Thus, we reject appellant's argument that section 1.07 precluded a deadly weapon allegation in his indictment. Under these circumstances, we cannot conclude the trial court erred by denying his motion to quash the indictment. We overrule appellant's seventh and eighth issues.

In issues eleven and twelve, appellant claims his guarantee against double jeopardy was violated because he was punished twice for the same conduct. Appellant concedes that the two offenses with which he was charged, causing one dog to fight another and using or permitting

another to use any real estate for dog fighting, are separate offenses but argues that, according to the State's pleadings and evidence, he committed only one offense: causing one dog to fight another dog on his property.

The protection against double jeopardy includes the protection against multiple punishments. *Speights v. State*, No. PD-0543-14, 2015 WL 3988969, at *2 (Tex. Crim. App. July 1, 2015). In the multiple punishment context, the double jeopardy clause prevents a court from prescribing greater punishment than the legislature intended. *Ex parte Benson*, 459 S.W.3d 67, 72 (Tex. Crim. App. 2015). The proper analysis is to determine whether the Legislature intended for the separate statutory subsections in a single statute to constitute distinct offenses. *Loving v. State*, 401 S.W.3d 642, 645 (Tex. Crim. App. 2013). We do so by conducting a "units" analysis. *Loving*, 401 S.W.3d at 645; *see Speights*, 2015 WL 3988969, at *2 (determining Legislature's intent concerning multiple punishments for different offenses defined within same statute may be ascertained by "unit[s] of prosecution" analysis).

The "units" analysis consists of two parts: (1) determining what the allowable unit of prosecution is, and (2) determining how many units have been shown. *Benson*, 459 S.W.3d at 73. The first part of the analysis is purely a question of statutory construction and generally requires ascertaining the focus or gravamen of the offense to determine the legislative intent. *Speights*, 2015 WL 3988969, at *4. The second part requires an examination of the trial record, which can include the evidence presented at trial. *Benson*, 459 S.W.3d at 74.

Under the first part of the analysis, "[a]bsent an express statement defining the allowable unit of prosecution, the gravamen of an offense best describes the allowable unit of prosecution." *Gonzales v. State*, 304 S.W.3d 838, 847–48 (Tex. Crim. App. 2010). The gravamen of an offense can be (1) the result of the conduct, (2) the nature of the conduct, or (3) the circumstances surrounding the conduct. *See* TEX. PENAL CODE ANN. § 6.03 (West 2011). To

determine the gravamen of a statutory provision, we use various tools, including a focus on grammar, and when examining the statute, we focus on sentence syntax and whether the statute refers to an item in the singular or plural. *See Jones v. State*, 323 S.W.3d 885, 888 (Tex. Crim. App. 2010).

Here, the gravamen of the dog fighting statute is the nature of the prohibited conduct, whether the defendant is accused of causing the dogs to fight or allowing the same to occur on his property. *See* TEX. PENAL CODE ANN. § 42.10(a)(1), (3); *Young v. State*, 341 S.W.3d 417, 423 (Tex. Crim. App. 2011) (in nature of conduct offenses, it is the act or conduct that is punished, regardless of any result that might occur). A person could commit dog fighting by allowing a dog fight on his property without being the person who caused one dog to fight another. Likewise, he could commit dog fighting by causing a dog to fight on property he does not own. "By these two distinct prohibitions, the Legislature has proscribed two distinct types of conduct." *Speights*, 2015 WL 3988969, at *3. Furthermore, because subsections (a)(1) and (3) prohibit either of those acts, the two subsections constitute separate and distinct statutory offenses, and are "discrete allowable unit[s] of prosecution." *Id*.; *Loving*, 401 S.W.3d at 648. When both offenses are committed, the State may indict a defendant for each offense, and he may be convicted and sentenced for each offense in a single prosecution. *Speights*, 2015 WL 3988969, at *4.

The second part of the analysis asks "how many units have been shown," and requires an examination of the record, including the evidence presented at trial. *Benson*, 459 S.W.3d at 73−74. We ask whether the evidence presented would support conviction and punishment under each theory of the offense. *Speights*, 2015 WL 3988969, at *4. As detailed above, the evidence showed appellant caused one of his dogs to fight another one of his dogs (most likely a bait dog). The evidence also showed that appellant allowed his property to be used for a dog fight when

Thomas caused his dog to fight with one of appellant's dogs. Although appellant has been punished for both offenses, his double jeopardy right to avoid being punished twice for the same offense has not been violated. *See id.* We overrule issues eleven and twelve.

We reverse the trial court's judgments to the extent appellant was found guilty of engaging in organized criminal activity in counts one and two and render judgment he is not guilty of engaging in organized criminal activity in counts one and two. We modify the trial court's judgments to reflect appellant was found guilty of the lesser included offenses of dog fighting by causing a dog to fight another and using his property for dog fighting. We remand this case to the trial court for a new punishment hearing as to each offense.

Do Not Publish
TEX. R. APP. P. 47.2(b)
140215F.U05

/Molly Francis/
MOLLY FRANCIS
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

BRIAN MARTIN, Appellant

No. 05-14-00215-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court At Law No. 1, Kaufman County, Texas
Trial Court Cause No. 31995CC.
Opinion delivered by Justice Francis, Justices Lang-Miers and Whitehill participating.

Based on the Court's opinion of this date, we **REVERSE** the trial court's judgments to the extent appellant was found guilty of engaging in organized criminal activity in counts one and two and **RENDER** judgment he is not guilty of engaging in organized criminal activity in counts one and two. We **MODIFY** the trial court's judgments to reflect appellant was found guilty of the lesser included offenses of dog fighting by causing a dog to fight another and using his property for dog fighting. We **REMAND** this case to the trial court for a new punishment hearing as to each offense.

Judgment entered July 22, 2015.